UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION

STACEY SUE JONES,                    )
                                     )
                                     )
          Plaintiff,                 )
                                     )          **1:22-CV-00052**
     vs.                             )
                                     )
COMMISSIONER OF SOCIAL SECURITY      )
ADMINISTRATION,                      )
                                     )

          Defendant.


## REPORT AND RECOMMENDATION

This matter is before the United States Magistrate Judge, under the standing orders of the Court and 28 U.S.C. § 636 for a report and recommendation. Claimant's claims for Disability Insurance Benefits and Supplemental Security Income were denied administratively by Defendant Commissioner following a hearing before an Administrative Law Judge ("ALJ"). This is an action for judicial review of that final decision of the Commissioner. Each party filed a dispositive motion [Docs. 18, 21] and supporting brief [Docs. 19, 22], and Claimant filed a reply brief in support of her Motion [Docs. 23, 26]. For reasons set forth below, the undersigned **RECOMMENDS** that Claimant's Motion [Doc. 18] be **GRANTED** as more specifically set forth below and the Commissioner's Motion [Doc. 21] be **DENIED**.

I.     **APPLICABLE LAW – STANDARD OF REVIEW**

A review of the Commissioner's findings is narrow. The Court is limited to determining (1) whether substantial evidence supported the factual findings of the Administrative Law Judge ("ALJ") and (2) whether the Commissioner conformed to the relevant legal standards. 42 U.S.C. § 405(g); *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009). "Substantial evidence

is more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994); *see also Mebane v. Comm'r of Soc. Sec.*, 382 F. Supp. 3d 718, 721 (S. D. Ohio 2019). It must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn is one of fact. *LeMaster v. Sec'y of Health & Human Servs.*, 802 F.2d 839, 841 (6th Cir. 1986). The Court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Emard v. Comm'r of Soc. Sec.*, 953 F.3d 844, 849 (6th Cir. 2020). At the same time, the Court may consider any evidence in the record, regardless of whether it was cited by the ALJ. *See Heston v. Comm'r of Soc. Sec.*, 245 F.3d. 528, 535 (6th Cir. 2001); *see also Kushner v. Comm'r of Soc. Sec.*, 354 F. Supp. 3d 797, 802 (E.D. Mich. 2019). A decision supported by substantial evidence must stand, even if the evidence could also support a different decision. *Wright-Hines v. Comm'r of Soc. Sec.*, 597 F.3d 392, 395 (6th Cir. 2010) (citing *Blakely*, 581 F.3d at 405); *see also Richardson v. Saul*, 511 F. Supp. 3d 791, 797 (E.D. Ky. 2021). On the other hand, a decision supported by substantial evidence "will not be upheld where the [Social Security Administration] fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2007); *see also Ackles v. Comm'r of Soc. Sec.*, 470 F. Supp. 3d 744, 752 (N.D. Ohio 2020).

A claimant must suffer from a "disability" as defined by the Act to be eligible for benefits. "Disability" includes physical and mental impairments that are "medically determinable" and so severe as to prevent the claimant from (1) performing his past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies. 42 U.S.C. § 423(a). A five-step sequential evaluation applies in disability determinations. 20 C.F.R. § 404.1520. The ALJ's review ends with a dispositive finding at any step. *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). A full review addresses five questions:

1.      Has the claimant engaged in substantial gainful activity?

2.      Does the claimant suffer from one or more severe impairments?

3.      Do the claimant's severe impairments, alone or in combination, meet or
        equal the criteria of an impairment set forth in the Commissioner's Listing
        of Impairments (the "Listings"), 20 C.F.R. Part 404, Subpart P, Appendix
        1?

4.      Considering the claimant's Residual Functional Capacity ("RFC"), can he
        or she perform his or her past relevant work?

5.      Assuming the claimant can no longer perform his or her past relevant
        work, and considering the claimant's age, education, past work experience,
        and RFC, do significant numbers of other jobs exist in the national
        economy which the claimant can perform?

*See* 20 C.F.R. § 404.1520. A claimant has the burden to establish benefits entitlement by proving

the existence of a disability. *See Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th

Cir. 1994); *see also Bowermaster v. Comm'r of Soc. Sec.*, 395 F. Supp. 3d 955, 959 (S.D. Ohio

2019). It is the Commissioner's burden to establish a claimant's ability to work at step five. *Moon*

*v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990); *see also Jones v. Berryhill*, 392 F. Supp. 3d 831,

855 (M.D. Tenn. 2019).

## II.      PROCEDURAL AND FACTUAL OVERVIEW

Stacey Sue Jones ("Claimant") filed for Social Security disability benefits and

supplemental security income on May 17, 2016,[1] alleging a disability onset date of April 1, 2016.

(Tr. Ex. 1D, 2D).[2] The claim was denied initially and again on reconsideration. (Tr. Ex. 3A-4A,

7A-8A). Thereafter, Claimant requested a hearing, and a hearing was conducted by Administrative

Law Judge ("ALJ") Kristie Luffman-Minor on April 26, 2018. (Tr. 33). Following the hearing, the

ALJ issued a decision on September 11, 2018, finding that Claimant was not disabled. (Tr. 27).

---

[1] The ALJ's decision states that Claimant filed for benefits on May 2, 2016 (Tr. 899), Claimant's brief states that she
applied for benefits on May 12, 2016 (Doc. 19), and the application summary states that she applied on May 17, 2016.
[2] References to page numbers in the Transcript, designated as "(Tr. ___)" are to the large black numbers in the bottom,
righthand corner of the page. References to Exhibits in the Transcript are designated as (Tr. Ex. ___, p. ___).

Claimant subsequently requested Appeals Council review, and the Appeals Council denied review. (Tr. l). Claimant then filed a complaint in the Eastern District of Tennessee at Chattanooga, and Magistrate Judge Debra Poplin remanded the case under Sentence Four of 42 U.S.C. § 405(g) on March 16, 2021. (Tr. Ex. 19A).

Claimant filed new claims for Social Security disability benefits and supplemental security income on January 29, 2020 and April 10, 2020. (Tr. Ex. 14D, 16D). Her claims were again denied initially and on reconsideration. (Tr. Ex. 18B, 22B). Thereafter, Claimant requested a hearing, and a telephonic hearing was conducted by ALJ Luffman-Minor on November 18, 2021. (Tr. 978, 980). The ALJ rendered unfavorable decisions on December 13, 2021, and on December 20, 2021. (Tr. 925, 965). The ALJ's December 20, 2021 decision (hereafter "the decision") became the final decision of the Commissioner of Social Security. *Id.*

In her decision, the ALJ made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2020;

2. The claimant has not engaged in substantial gainful activity since April 1, 2016, the alleged onset date;

3. The claimant has the following severe impairments: adjustment disorder with mixed anxiety and depressed mood; bipolar disorder; post-traumatic stress disorder (PTSD); excoriation disorder; obesity; degenerative osteoarthritis, moderate in the bilateral knees as of June 2, 2021; and mild degenerative arthritis of the lumbar and cervical spine;

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1;

5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except she can never climb ladders, ropes or scaffolds, or be exposed to workplace hazards including unprotected heights, or dangerous moving machinery; can occasionally engage in other postural activities; can frequently handle/finger with the bilateral upper extremities; can understand, remember and carry out simple, routine instructions; can understand, learn terms and instructions and procedures, and use reason and judgment typically required for simple routine work; should have no

contact with the public, and occasional contact with co-workers and supervisors, but should not perform work in team formats; would work better with things rather than people; and can deal with changes in routine work setting on an infrequent and gradual basis. From June 2, 2021 through at least August 20, 2021, the evidence supports degenerative changes in the knees which, in combination with other impairments, imposed limitations to light work, with standing and walking only 4 hours in an 8-hour workday; and the nonexertional limitations set forth above;

6. The claimant is unable to perform any past relevant work;

7. The claimant was born on December 31, 1967 and was 48 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. The claimant subsequently changed age category to closely approaching advanced age;

8. The claimant has a limited education;

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills;

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform;

11. The claimant has not been under a disability, as defined in the Social Security Act, from April 1, 2016, through the date of this decision.

(Tr. 901-925).

On appeal, Claimant asserts that the ALJ erred at Step Two of the five-step evaluation process in finding that several of Claimant's impairments were not medically determinable and/or did not address how those impairments impacted her ability to perform work, and as a result, the ALJ's RFC formulation did not fully account for her limitations. [Doc. 19]. Claimant first argues that signs and laboratory findings contained in the record support a finding that she had a medically determinable impairment in her hands and fingers and that the ALJ's finding to the contrary is not supported by substantial evidence. *Id.* at 6. Specifically, Claimant points to evidence in the record that she suffers from inflammatory arthritis (osteoarthritis), which significantly impacts her functioning. *Id.* at 6-9. Additionally, Claimant asserts that the ALJ should have considered how her obesity, which was found to be a severe impairment, impacts her ability to use her hands and

fingers. *Id.* at 6, 11-12. Claimant further contends that the ALJ erred in declining to find her intellectual disorder to be a medically determinable impairment. *Id.* at 14. Claimant contends that "[o]bjective medical evidence in the form of clinical interviews, mental status evaluations and clinical testing support a finding that [her] intellectual disorder is a medically determinable impairment." *Id.* In support, Claimant references IQ and grade level testing she underwent which found her to have low intellectual abilities and avers that the ALJ erred in how she treated evidence of Claimant's education level. *Id.* at 14-21. Finally, Claimant contends that the degenerative joint disease in her knee should have been found to be a medically determinable impairment. *Id.* at 21. In support of this argument, Claimant points to examinations which support her contention of chronic knee pain and degenerative joint disease. *Id.* at 21-22. Claimant argues that if the ALJ had considered the full range of evidence regarding her knee impairment in conjunction with her obesity, the RFC formulation would have placed Claimant in the sedentary or less level of exertion. *Id.* at 23. In closing, Claimant requests that the ALJ's decision be reversed and that she be awarded benefits, or in the alternative, that her case be remanded for further consideration.

In response, the Commissioner contends that substantial evidence supports the ALJ's findings that certain of Claimant's impairments did not meet the requirements to be considered medically determinable impairments. [Doc. 22]. The Commissioner first asserts that the ALJ properly considered Claimant's medical records when considering whether she had a medically determinable impairment in her hands and fingers. *Id.* at 9. The Commissioner points to normal examination findings in the medical record in arguing that there was no objective medical evidence of carpal tunnel syndrome or rheumatoid/inflammatory arthritis. *Id.* Nevertheless, the Commissioner contends that the ALJ considered Claimant's upper extremity conditions in the sequential evaluation process. *Id.* at 10. The Commissioner next responds to Claimant's arguments regarding her mental impairment. *Id.* at 15. The Commissioner maintains that "the ALJ properly evaluated the condition and found it was not a medically determinable impairment." *Id.* In support

of this argument, the Commissioner points to conflicting evidence of Claimant's cognitive functioning and academic history. *Id.* at 15-21. The Commissioner also argued that "Plaintiff received treatment from Hiwassee Mental Health Center, beginning March 2016 (Tr. 622). During the course of her treatment, her providers observed that, while she had occasions where she had abnormal thought processes, paranoia, and reported hallucinations, her medical records also showed normal thought processes, normal speech, normal associations, normal memory, normal language, normal fund of knowledge, normal judgment, and/or normal attention and concentration (Tr. 484, 491-492, 498, 594, 600, 1967, 1976, 1992, 2001-2002, 2010-2011, 2018-2019, 2026-2027, 2036, 2044, 2052, 2060, 2067-2068, 2074-2075, 2083, 2090, 2098, 2419-2420, 2473-2474, 2492-2493, 2499-2500, 2506-2507, 2513-2514, 2521-2522, 2528-2529, 2535-2536, 2543, 2590-2591, 2598-2599)." [Doc. 22, p. 3]. This section of the Commissioner's argument could be read as indicating that all the records cited herereflect "normal" psychological findings; however, in reviewing these citations against the record, the Court notes that those cited contain both "normal" and "abnormal" findings, with most of the cited records including at least one "abnormal" psychological finding. Further, the Commissioner appears to have cherry-picked specific portions of individual treatment records that reflect at least some normal findings, when elsewhere in the same record additional abnormalities are noted. For example, page 2493 of the Transcript contains a portion of Claimant's progress note from her October 9, 2020 visit to Hiwassee Mental Health Center. While that page does reflect normal findings regarding Claimant's thought processes, judgment/insight, attention/concentration, and fund of knowledge, an abnormal mood and affect is noted, and a subsequent page in the same progress note, page 2494, notes that Claimant's overall progress is worsening, with an additional notation of anxiety and mood swings.[3]

---

[3] The Court has addressed this issue in the section containing the parties' arguments as opposed to under the legal analysis section for the sake of clarity.

Finally, the Commissioner addresses Claimant's alleged knee impairment. *Id.* at 22. The Commissioner argues that Claimant has failed to show an error in the ALJ's analysis of her degenerative joint disease, because the Claimant pointed to her obesity as impacting her impairment but did not show how obesity impacted her knees. *Id.* at 22-23. In sum, the Commissioner asks the Court to affirm the decision of the ALJ.

Claimant filed a reply brief reiterating her arguments regarding her alleged impairments and elaborating on the impairments. [Docs. 23, 26]. Specifically, she asserts that the ALJ's decision ignores the progressive and permanent nature of her osteoarthritis and that the ALJ improperly discounted Claimant's IQ and grade level testing. *Id.*

In addressing this matter on appeal, the Court has carefully reviewed and considered Claimant's medical records and will address them as necessary to fully analyze the issues raised by the parties. (Tr. Ex. 1F-29F). Additionally, the Court has reviewed and considered the opinions provided by state agency medical and psychological consultants. (Tr. Ex. 1A-2A, 5A-6A, 10A-11A, 14A-15A). Lastly, the Court has evaluated the hearing testimony. (Tr. 980-1017). Having done so, the Court will now address the errors alleged by Claimant in the context of the parties' arguments and applicable law.

## III.   LEGAL ANALYSIS

Claimant asserts that the ALJ erred in evaluating her impairments at Step Two, which ultimately led to the ALJ erring in formulating Claimant's RFC. In reviewing the ALJ's decision for error, the Court must keep in mind that the ALJ is entitled to a "zone of choice" in determining whether Claimant is disabled and if the facts could support a ruling either way, then the ALJ's decision must be upheld. *Blakely*, 581 F.3d at 406.  As such, the Court will not disturb the ALJ's decision even if the Court would have decided the matter differently so long as the ruling was rendered in compliance with applicable law and is based on substantial evidence. "Substantial evidence exists when a reasonable mind might accept the relevant evidence as adequate to support

a conclusion." *Stewart v. Comm'r of Soc. Sec.*, 811 F. App'x 349, 352 (6th Cir. 2020) (internal citations omitted); *Fox v. Comm'r of Soc. Sec.*, 827 F. App'x 531, 534 (6th Cir. 2020) (quoting *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154, 203 L.Ed.2d 504 (2019)).

### a. *Claimant's Alleged Intellectual Disorder*

Claimant alleges that the ALJ erred in failing to find that her intellectual deficit or disorder was a medically determinable impairment. In making this assertion, Claimant points to testing performed by Dee Langford, Ed.D., H.S.P., who evaluated Claimant at the request of the Administration on September 7, 2021.[4] (Tr. Ex. 29F, p. 2606-18). As an initial matter, the Court notes that an impairment can be considered non-severe only if the impairment is a "slight abnormality which has such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, and work experience." *Farris v. Sec'y of Health and Human Servs.*, 773 F.2d 85, 90 (6th Cir. 1985) (quoting *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984)); *see also Germany-Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 774 (6th Cir. 2008).

In assessing Claimant, Dr. Langford noted that Claimant's "level of cleanliness and hygiene were poor" at the time of the evaluation and that "[h]er clothing was appropriate to the season but not the situation." *Id.* at 2607. Dr. Langford further documented that Claimant's teeth were all bad and painful, according to Claimant. *Id.* Additionally, Dr. Langford observed Claimant have a slow gait and anxious facial expression. *Id.* When asked by Dr. Langford to describe her mood over the last month, Claimant advised that she had been depressed and anxious. *Id.* at 2608.

---

[4] Claimant underwent a psychological consultative examination on August 17, 2016 with Benjamin James Biller, MS and James Trevor Milliron, Ph.D. in which she was assessed with adjustment disorder with mixed anxiety and depressed mood, and was found to have moderate limitations in understanding, remembering, and carrying out instructions, mild-moderate limitations in concentration, persistence and pace, and moderate-marked limitations in social interaction, but minimal limitations in adaptation. (Tr. Ex. 5F, p. 438-39).

During that evaluation, Claimant underwent the Wechsler Adult Intelligence Scale-IV ("WAIS-IV") and Wide Range Achievement Test-5 ("WRAT-5"). *Id.* at 2611-15. Claimant's Full Scale IQ score was determined to be 64, while she tested at a "very low to extremely low" grade level of functioning. *Id.* at 2611-12. Claimant's WAIS-IV results reflected that she fell in the bottom 1% in verbal reasoning abilities, in the bottom 5% in nonverbal reasoning abilities, in the bottom 2% in ability to sustain attention, concentration, and exert mental control, and the bottom 2% in her ability to process simple or routine visual material without making errors. *Id.* at 2611. Each of these findings carried with it a 95% confidence interval. *Id.*

As to her WRAT-5 results, Claimant tested at a second-grade level in spelling, a grade level of 2.8 in word reading, a grade level of 3.5 in math computation and a grade level of 4.3 in sentence comprehension. *Id.* These scores placed Claimant in the extremely low range for spelling and word reading and the very low range for math computation and sentence comprehension. *Id.* Dr. Langford observed that Claimant "may fall near the Borderline range of cognitive functioning," and would need help managing her money. Claimant had reported to Dr. Langford that she completed the 6th grade, and the doctor did note that Claimant's test scores "did not appear to well represent the abilities of someone who has completed the 6th grade." *Id.* at 2608, 2612. While the ALJ in her opinion states that this comment by Dr. Langford indicated that Dr. Langford found "a discrepancy between her ability to complete 6th grade, and her lower test scores", this conclusion overlooks Dr. Langford's finding that Claimant's "[t]est results appear to be a generally valid representation of the [Claimant's] abilities. The [C]laimant's scores were fairly consistent with her overall presentation." [5] *Id.* at 903; (Tr. Ex. 29F, p. 2610). Dr. Langford further observed

---

[5] In many parts of the ALJ's decision, the Court had difficulty discerning what records she relied upon to support her opinion as specific exhibit/page numbers cited in support did not actually include information addressing the proposition for which it was cited, or the citation was to such a broad amount of material that it was difficult to determine what portion of the material supported her assertion.

as follows as to this issue: "[Claimant] reports having completed the 6th grade. However, her seeming level of awareness and knowledge appear to fall below that academic level, as though she has not been part of or had an interest in the world in the ensuing years." (Tr. Ex. 29F, p. 2614). The Court notes that, as addressed below, this observation by Dr. Langford appears to well summarize Claimant's long term mental health profile, where she consistently describes difficulty leaving her home to go other places and a preference for staying at home so she can avoid public spaces.

Despite these test scores, the ALJ found that Dr. Langford's opinion was invalid because Claimant had completed the 6th or 7th grade,[6] had found employment, and had completed forms with the help of others. As to Claimant's grade level, the Court notes Claimant testified that she discontinued school in the 7th grade, after having already failed that grade once. (Tr. 986). At the time, she was sixteen years of age. (Tr. 1387). She testified that she had been enrolled in the special education program throughout her years in school, although her testimony regarding the types of special education services she received during the most recent hearing referenced only services related to speech. *Id.*; (Tr. 988). At the same time, when asked about her ability to read, Claimant advised that she could only read simple children's books such as "Jack and Jill or "Cat in a Hat (*sic*)." While the ALJ found that Claimant had been enrolled in the regular education curriculum, the record is not at all clear on that point and given that Claimant was sixteen and only in the 7th grade at the time she discontinued her education, the fact that she had failed 1st and 7th grade, and her need for at least some special education services, there is significant evidence indicating that Claimant was not functioning at grade level. The ALJ noted in her opinion that Claimant did not

---

[6] The ALJ notes conflicting information in the record regarding whether Claimant had completed the 6th grade or 7th grade and why Claimant discontinued her education. Claimant's testimony clarified that she discontinued her education in the 7th grade, at least in part because she was pregnant. (Tr. 903; Tr. Ex. 2F, p. 346). However, she further stated that she dropped out of school because at 16 she was only in the 7th grade and was "so far behind." *Id.;* (Tr. 1387).

provide any educational records to support her testimony regarding the difficulties she experienced in school, but the record evidence demonstrates that when the Administration attempted to obtain special education records for Claimant from the Hamilton County School System, the school system responded with a notice that the records had been destroyed. (Tr. Ex. 17F, p. 2342). On a last note, the ALJ mentions in her opinion that Claimant unsuccessfully attempted to obtain her GED. Claimant testified about that attempt during her November 18, 2021 hearing before the ALJ, explaining that she started a "GED at a Methodist church with two women that was helping me, but I went as far as I can go and then I just stopped. I didn't know what else to do or understand it… I just didn't understand it. I couldn't go no further or knowing what to do." (Tr. 987).

In addition to Dr. Langford specifically addressing Claimant's intellectual functioning, she addressed cognition issues, noting that Claimant "may fall near the low average range of cognitive functioning," "showed evidence of mild to moderate impairment in her short-term memory," "showed evidence of mild to moderate impairment in ability to sustain concentration," and "showed evidence of mild to moderate impairment in long-term and remote memory functioning," and had a limited ability to perform consistently from a psychological perspective. (Tr. Ex. 29F, p. 2609-10). While Dr. Langford described Claimant as cooperative during the evaluation, she noted that Claimant was overly chatty and appeared anxious and depressed. *Id.* at 2609. Dr. Langford found "no evidence of malingering" but stated that Claimant "may be exaggerating her condition to some extent." *Id.* She further opined that Claimant "gave a seemingly good effort throughout the interview." *Id.*

Beyond testing Claimant's intellectual functioning, Dr. Langford reviewed a Social Security Function Report and obtained information directly from Claimant regarding Claimant's psychological and physical health conditions. (Tr. Ex. 29F, p. 2606-07). In doing so, Dr. Langford

learned that Claimant's reported conditions included bipolar disorder with psychosis, anxiety and depression, excoriation disorder, post-traumatic stress disorder, obesity, osteoarthritis, spinal stenosis, pain in legs and feet, left hip pain, and GERD. *Id.* at 2606. In obtaining Claimant's mental health history, Dr. Langford found that there was a history of mental illness in Claimant's immediate family, with her mother being diagnosed as schizophrenic (although Claimant advised Dr. Langford she did not know what that meant) and was further advised that Claimant had been a victim of domestic abuse. *Id.* at 2610, 2615. When speaking with Claimant about her physical health conditions, Dr. Langford noted that Claimant reported several and opined that those concerns seemed to be a secondary reason for Claimant seeking disability. *Id.* at 2610.

The ALJ also pointed to a note in Claimant's Lookout Mountain mental health records where they "estimated" that Claimant had average intellectual functioning, but that conclusion ignores the fact that this provider performed no testing of Claimant's intellectual functioning. Moreover, the Court notes that these records reflect that Claimant presented to Lookout Mountain for treatment of her mental health conditions such as anxiety and depression, and that while a box was checked noting an estimated intelligence level of "average," during the same visit Claimant's records documented that she was experiencing racing thoughts, an anxious mood, problems concentrating, obsessive thoughts, and self-mutilation, and that her affect was flat. (Tr. Ex. 2F, p. 353). Of note, it is well-settled that check-the-box forms, like that documenting Claimant's "average" intelligence level, are "weak evidence at best." *Gladson v. Saul*, No. 6:20-064-DCR, 2020 WL 6689196, at *7 (E.D. Ky. Nov. 12, 2020) (quoting *Hernandez v. Comm'r of Soc. Sec.*, 644 F. App'x 468, 473 (6th Cir. 2016)) (internal quotation omitted); *see also Smith v. Astrue*, 359 F. App'x 313, 316 (3rd Cir. 2009) ("checklist forms…which require only that the completing physician 'check a box or fill in a blank' rather than provide a substantive basis for the conclusions

stated are considered 'weak evidence at best' in the context of a disability analysis.") (citations omitted).

Additionally, the ALJ notes that Claimant testified about only being able to obtain a driver's license because her husband read the materials for her and how her daughter had to assist her with completing job applications and disability forms and using the internet but then goes on, without any citation to the record, to state that Claimant had no problems with reading, writing and/or understanding in completing her disability application. (Tr. 19, 944). However, Claimant has stated that either her caseworker or daughter filled out her paperwork for her. (Tr. 437). The ALJ further notes that Claimant had to be taught by bank employees how to fill out a deposit slip but fails to place weight on Dr. Langford's opinion that Claimant would need help in managing any disability funds awarded. (Tr. 944; Tr. Ex. 29F, p. 2615). The ALJ then makes a blanket statement about Claimant being able to successfully raise two children to adulthood, without providing any reasoning as to why that invalidates Dr. Langford's findings. (Tr. 945). The ALJ further references Claimant's ability to shop, drive, and prepare complete meals but omits from her findings Claimant's testimony that "shopping" for her involves picking up a few items at the Dollar Store; that Claimant drives only to the Dollar Store or a convenience store and to the doctor, but only if her daughter cannot take her; and that making meals typically involves microwaving soup or making a sandwich. (Tr. 945, 984-85). With that said, in her July 22, 2016 function report, Claimant did mark the box that says she grocery shops in stores, but she clarifies by stating that she does not like going to stores. (Tr. 252). In her most recent hearing testimony, Claimant testified that she does not grocery shop for herself because she does not like being in the grocery store as she feels overwhelmed and has high anxiety because of the number of people in the store. (Tr. 986). Of additional note, the ALJ discounted Claimant's intellectual difficulties because she noted

that Claimant could discuss her medical history, including terminology, and the medications that she takes. However, the Court notes that Claimant made errors during the hearing in describing her conditions. *See* (Tr. 991, 1003) (reflecting Claimant's reference to "cartridge" rather than "cartilage"); (Tr. 989-990) (reflecting Claimant's need for her attorney to explain to her what excoriation means despite Claimant having been diagnosed with that condition for many years). Moreover, the conditions which Claimant was able to discuss accurately are ones which are longstanding for her; thus, it is difficult to see how the mere fact she can relay some information about these conditions and her daily medication to someone else after dealing with them for so many years indicates that she is functioning at a higher level than her test scores indicated.

The ALJ appears to have discounted Claimant's intellectual disabilities in her disability assessment because Claimant was able to obtain employment in the past despite any intellectual disabilities. In doing so, the ALJ ignored her obligation to consider all of Claimant's mental health conditions, including her intellectual functioning, in conjunction with her present ability to otherwise function physically and mentally. In determining whether a claimant is capable of working, Sixth Circuit precedent requires the ALJ to consider "the combined effect of all of the claimant's impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity to render the claimant disabled." *Smith-Marker v. Astrue*, 839 F. Supp. 2d 974, 983 (S.D. Ohio 2012) (citing *Walker v. Sec'y of Health & Human Servs.*, 980 F.2d 1066, 1071 (6th Cir.1992)). While the ALJ found Claimant's intellectual disabilities not to constitute a medically determinable impairment, given the well-documented evidence of her low functioning, the Court cannot find this conclusion to be supported by the evidence of record. Even if the Court assumes that Claimant's intellectual disability is non-severe, when an ALJ finds one or more severe impairments, as is the case here, "the ALJ must consider limitations and restrictions

imposed by all of an individual's impairments, even those that are not 'severe.'" *Fisk v. Astrue*, 253 F. App'x 580, 583 (6th Cir. 2007) (quoting Soc. Sec. Rul. 96-8p, 1996 WL 374184, at *5) (internal quotations omitted).

The Court further notes that pursuant to 20 C.F.R. § Pt. 404, Subpt. P, App. 1, "[o]nly qualified specialists, Federal and State agency medical and psychological consultants, and other contracted medical and psychological experts may conclude that [a claimant's] obtained IQ score(s) is not an accurate reflection of [the claimant's] general intellectual functioning." 20 C.F.R. § Pt. 404, Subpt. P, App. 1. Here, the ALJ has impermissibly substituted her own medical judgment for the findings of Dr. Langford. As noted above, an ALJ's decision must "not be upheld where the [Social Security Administration] fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2007); *see also Ackles v. Comm'r of Soc. Sec.*, 470 F. Supp. 3d 744, 752 (N.D. Ohio 2020). In making this determination, the Court does not overlook the fact that the ALJ did take into consideration some of the limitations contained in Dr. Langford's check-the-box form included in her evaluation. (Tr. 906). However, because the ALJ failed to follow the Administration's own regulations in assessing Claimant's intellectual functioning and how her documented functioning deficits impacted her ability to perform work in conjunction with Claimant's other mental health and physical limitations, the Court must find that Claimant has been deprived of a substantial right in the review of her claim for disability.

While the ALJ's treatment of this issue alone requires that the Court recommend the ALJ's decision be reversed, the Court will briefly address other of Claimant's mental and physical health conditions where the ALJ's analysis of them appears not to fully comport with the record and applicable law. If the District Court confirms this Court's recommendation to remand, the Court

strongly encourages the Administration to review all of Claimant's physical and mental health conditions with a fresh eye in light, taking into account the Court's observations below.

### b. Claimant's Other Mental Health Disorders

While the Court will not fully address all findings made by the ALJ regarding Claimant's mental health, there are certain examples of problematic findings made by the ALJ which the Court finds it necessary to briefly cover. For example, the ALJ references Claimant self-diagnosing with OCD, and states that Claimant has no such diagnosis. However, this finding is in direct conflict with the medical evidence of record. Claimant has a longstanding diagnosis of excoriation disorder, which falls within the family of obsessive-compulsive disorders. The Fifth Edition of the Diagnostic & Statistical Manual of Mental Disorders clearly addresses this issue, stating that "[o]bsessive-compulsive and related disorders include … excoriation (skin-picking) disorder..." Obsessive-Compulsive and Related Disorders, Diagnostic & Statistical Manual of Mental Disorders, 5th ed. S2H6. "Excoriation (skin-picking) disorder is characterized by recurrent picking of one's skin resulting in skin lesions and repeated attempts to decrease or stop skin picking", and the behavior "may be preceded or accompanied by various emotional states, such as feelings of anxiety or boredom." *Id.* This diagnosis is in lockstep with Claimant's reports of high anxiety. Moreover, this is a condition that Claimant has struggled with since at least her teenage years, and she has been prescribed Hydroxyzine to treat it for many years. Claimant notes that the medication makes her sleepy.[7]

---

[7] In discounting Dr. Langford's finding, the ALJ notes that Claimant might not have performed at her best on the tests administered to her due to taking her medications, including Hydroxyzine. However, Claimant has a well-documented ongoing need for these medications and, as such, would be continuing to take them on an ongoing basis; therefore, she would be expected to perform in a work setting at the level reflected by Dr. Langford's testing. (Tr. 920). Further, the ALJ must consider the impact of Claimant's medication, i.e., the drowsiness it causes, on her ability to perform work. *See* SSR 96–7p; *see also Davidson v. Sec'y of Health & Hum. Servs.*, 995 F.2d 1066 (6th Cir. 1993) (observing

Claimant has repeatedly advised her treatment providers that she has difficulties with being around people and tries to avoid leaving her home. However, the ALJ severely discounts Claimant's mental health claims on this front, doing so in large part because Claimant interacted in a home setting with her children, her daughter's boyfriend, and her grandchildren (and with her own boyfriend before they separated), as well as in a medical environment with her medical providers. The ALJ does not explain how the ability to interact in her home environment and one-on-one with medical providers undercuts Claimant's reports of the anxiety she experiences when being outside her home. Moreover, even in interacting with her family, Claimant notes that while she will hug her grandchildren and she is happy to be around them, Claimant sits back and watches them as opposed to actively interacting with them because of her mental health challenges. (Tr. 1160).

In discounting Claimant's reported anxiety when leaving her home, the ALJ further emphasizes Claimant's ability to shop and mentions five times in her December 20, 2021 opinion how this ability to shop includes shopping at flea markets. *See* (Tr. 904, 911, 921, 923). However, there has been no mention of going to a flea market that the Court could find since Claimant's 2018 hearing testimony. (Tr. 1160). Prior to that hearing, in a single treatment note dated June 27, 2016, Claimant's therapist mentioned that Claimant "is getting [out] a little more, went to the flea market this weekend." (Tr. Ex. 7F, p. 459). When Claimant testified at her hearing in 2018 about going into the flea market, she stated that she had done so at the suggestion of her therapist, that there was one little store that she and her boyfriend would go in, that she had difficulty breathing because of dust in the store, and that she felt claustrophobic while there. (Tr. 1160-61). The record

_____

that like pain, the side effects of medications can have a significant impact on an individual's ability to work and should figure in the disability determination process).

demonstrates that what Claimant has meant by shopping over time is picking up a few items at a Dollar Store or other convenience store near her home. (Tr. 985); *see also* (Tr. 438) (noting that back when she lived with her boyfriend that he did the grocery shopping so she could avoid stores). As noted above, even when she did occasionally go to the grocery store in earlier times, she referenced the anxiety it caused her to do so. *See* (Tr. 1158) (containing Claimant's testimony that she occasionally went to a "Fresh n' Low" up the street from her home but that she usually feels panicky and just wants to get out and on one occasion had a full-blown panic attack requiring her to leave her buggy and go home).

Another reason provided for the ALJ discounting Claimant's concerns regarding leaving her home is that she went to church a few times, again at the suggestion of her therapist. (Tr. 1160-1161). While the ALJ notes in her opinion, Claimant's comments about how she "found some of the congregants to be phony" the ALJ failed to mention Claimant's testimony about why she quit going to church after just a few times, which was as follows: "I just feel anxiety when it comes to – it's like I want to jump out of my skin when I get around a lot of people. And, I seem to do fine when I'm by myself even with the racing thoughts, I mean I talk to myself." (Tr. 1161).

The record demonstrates that Claimant's difficulties have persisted throughout the period of alleged disability. She has routinely received mental health treatment and has been consistently prescribed mental health medication. While the ALJ attempts to categorize Claimant's findings as generally normal, her records note that Claimant hears voices at times, that her affect has frequently been reported as flat both by her physical and mental health providers, and that she is diagnosed with PTSD, adjustment disorder with mixed anxiety and depressed mood, bipolar

disorder with psychosis[8], and excoriation disorder. *See* (Tr. Ex. 7F, p. 565-66; Tr. Ex. 13F, p. 1481; Tr. Ex. 14F, p. 1546, 1552, 1555, 1564, 1567, 1570) (providing select examples from Claimant's treatment providers documenting Claimant's affect as flat,[9] with some documenting ongoing anxiety, hallucinations, dysthymic mood, feelings of hopelessness and helplessness, and ongoing picking of her skin); (Tr. Ex. 23E, p. 1421, 1435-37) (providing select examples demonstrating that Claimant continued to hear voices despite taking her mental health medications prescribed for her condition); (Tr. Ex. 16F, p. 1482; Tr. Ex. 20E, p. 1411; Tr. Ex. 23E, p. 1420, 1435; Tr. Ex. 14F, p. 1549, 1563) (providing select examples of Claimant's diagnosis and ongoing treatment for depression, anxiety, and bipolar with psychosis). Additionally, while her records reflect that at times her mental health is better than others, she has consistently reported severe effects from these conditions.

Given the highs and lows typically contained in mental health records, the Sixth Circuit has advised that ALJs are not to rely on terms such as "improvement" or "better" alone when determining whether a claimant's mental health symptoms have subsided. *Boulis-Gasche v. Comm'r of Soc. Sec.*, 451 F. App'x 488, 494 (6th Cir. 2011) (observing that "[u]nder the ALJ's logic, any improvement in one's mood, regardless of how small and from what level the individual improved, would defeat a claim of mental impairment. This cannot be so."). Instead, ALJs are instructed to dig further into treatment records to consider the nature and extent of any improvement. *Id.* Here, by taking the position that the improvement in Plaintiff's symptoms from time-to-time meant that her mental health conditions were not a significant factor in her ability to

---

[8] While Claimant has been diagnosed with bipolar disorder with psychosis, the ALJ listed "bipolar disorder" as her severe impairment without reference to the psychosis, although she does refer to the psychosis aspect of Claimant's diagnosis in the body of her opinion. (Tr. 902; Tr. Ex. 11A, p. 1056).

[9] A flat affect is defined as a lack of signs expressing "emotion tied to ideas or mental representations of objects." Dorland's Illustrated Medical Dictionary (33rd ed. 2020).

perform work, "the ALJ impermissibly substitute[ed her] own judgment for that of a physician." *McCain v. Dir., Office of Workers Comp. Programs,* 58 F. App'x 184, 193 (6th Cir. 2003). Of further note, in *Boulis-Gasche,* the Sixth Circuit specifically rejected the ALJ's conclusions regarding Claimant's mental health, finding that those conclusions appeared to be grounded in a myopic reading of the record combined with a flawed view of mental illness. 451 F. App'x 488, 494 (6th Cir. 2011); s*ee also Schmidt v. Sullivan,* 914 F.2d 117, 118 (7th Cir. 1990) (noting that judges, including ALJs in social security cases, must resist the "temptation to play doctor"). Finally, the Court notes that an ALJ must consider mental health diagnoses in a different light than physical conditions, in that there is often no objective means for confirming certain mental health disorders. *See Ward v. Comm'r of Soc. Sec.*, 613 F. Supp. 3d 1034, 1042 (S.D. Ohio 2020) ("In the realm of mental health impairments, clinical observations made by mental health professionals serve as the only objective evidence available to substantiate the existence, persistence, and limiting effects of such impairments.") (citations omitted). Here, it appears that the ALJ "cherry-picked" from the record by emphasizing any improvement in Claimant's condition, while downplaying the very serious and ongoing mental health conditions that she continues to experience. "It is generally recognized that an ALJ 'may not cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding.'" *Meeks v. Comm'r of Soc. Sec.*, No, 2018 WL 1802444, at *7 (E.D. Tenn. Apr. 16, 2018) (quoting *Biermaker v. Comm'r of Soc. Sec.*, No. 14-12301, 2016 WL 7985329, at *9 (E.D. Mich. June 13, 2016)).

### c. *Claimant's Physical Impairments*

While the ALJ found Claimant to have some limitations based upon physical impairments, through at least June 1, 2021, she found that Claimant could engage in work at the medium exertion level. (Tr. 906). In asserting that she experiences serious physical health issues which have limited her to an exertion level less than the medium work category requires, Claimant first points to the medical records from the Emergency Department at Erlanger Hospital, where she received treatment following a serious automobile collision in July 2010. *See* (Tr. Ex. 1F). During the collision, Claimant experienced blunt chest trauma and immediately began having pain in her neck and back. *Id.* at 314. Her records further note that she sustained an injury to her hand, thumb and 2nd digit, although the records conflict as to which hand was involved. *Id.* at 315-16. Because Claimant was seen in the Emergency Department following her collision, the hospital performed several diagnostic studies to assess her condition, despite Claimant not having health insurance which would pay for the testing. *Id.* at 316-319. A CT scan of Claimant's cervical spine revealed no acute fractures or trauma related injuries but documented existing "small anterior osteophytes" … "from C4 through C7 consistent with mild spondylosis." *Id.* at 327. A CT scan of the thoracic and lumbar spine was performed as well, and the results indicated that the results were normal for acute trauma but that there was existing "mild sclerosis of the posterior facets from L1 through L5 [which] are consistent with osteoarthritis." *Id.* at 331. In addition to seeking emergency room treatment because of this collision, Claimant sought it on five other occasions for acute pain from 2013 to 2016. (Tr. Ex. 3F, p. 366, 382, 392; Tr. Ex. 4F, p. 411, 421.) On two occasions she sought treatment for low back pain with the pain radiating into her left buttock during one of the visits, on another the treatment was sought for pain in Claimant's mid to upper back, on a fourth visit

Claimant was experiencing left shoulder pain, and the other visit resulted from Claimant having right hamstring pain radiating to below her knee. *Id.*

In 2016, Claimant began receiving treatment at the Bradley County Health Department. (Tr. Ex. 6F). Over the course of her treatment there, in addition to addressing routine health concerns, Claimant reported the following: pain in her back, hands, in the joints of her fingers, her left hip,[10] legs (including restless legs), and knees. (Tr. Ex. 6F, p. 441-43; Tr. Ex. 9F, p. 634, 647-48, 652-53, 656; Tr. Ex. 13F, p. 1486, 1489, 1492, 1495-96, 1498-99, 1502, 1507, 1543, 1545-46, 1548, 1552, 1560, 1563) (citing to some examples in the Health Department records where Claimant reported pain to these areas). Claimant further reported a long-existing need for carpal tunnel surgery on her left hand, noting that she had previously had it on the right hand. (Tr. Ex. 6F, p. 442). Her provider noted that Claimant's sedimentation rate was elevated and the joints in her fingers were noted to be warm and swollen, but she was negative for rheumatoid arthritis. *Id.* at 444. Claimant reported that she had been experiencing the pain in the joints of her fingers for five to six years and that she was having an increasing number of knots in her fingers. *Id.* at 446. Claimant was diagnosed with chronic lumbago and osteoarthritis with chronic arthralgias, with Claimant asserting as of 2017 that she had been experiencing back pain for ten years and hip pain for more than five years. (Tr. Ex. 9F, p. 652; Tr. Ex. 13F, p. 1480; Tr. Ex. 14F, p. 1555).

Claimant was ultimately able to obtain an appointment with orthopedic physician Matthew D. Higgins, M.D. to further assess Claimant's ongoing knee pain, including the increase in pain she had experienced due to a twisting injury. (Tr. Ex. 27F, p. 2568.) Dr. Higgins performed x-rays which demonstrated that Claimant had "severe varus alignment with complete loss of the medial

---

[10] The ALJ correctly notes that in a different instance imaging performed of Claimant's right hip was negative (Tr. Ex. 18F, p. 2363), but as referenced here, it appears that while Claimant complained of right hip pain during this visit her primary complaint of hip pain was on the left.

joint space, with a patellofemoral joint which showed mild narrowing" and "[o]steophytes forming diffuse around the femur tibia and patella." *Id.* Dr. Higgins diagnosed Claimant with bilateral knee varus degenerative joint disease, confirming that she was experiencing osteoarthritis in her knees in addition to her back and hands. *Id.* at 2570. Dr. Higgins provided Claimant with an injection in her left knee and noted that if that did not improve her condition, he would look at whether to try "viscosupplementation versus discussion of possible arthroplasty options[,]" i.e., possible knee replacement. (Tr. Ex. 27F, p. 2580-81).

The ALJ significantly discounted Claimant's alleged physical conditions and imposed only the following limitations on Claimant's physical activity: 1) no climbing ladders, ropes, or scaffolds, 2) no exposure to unprotected heights or dangerous moving machinery, 3) only engage in postural activities on an occasional basis, and 4) only engage in frequent handling and fingering activities. (Tr. 906). The ALJ found that as of June 2, 2021, Claimant would be limited to light exertion work where she could walk only 4 hours in an 8-hour workday due to Dr. Higgins' opinions regarding Claimant's knees.[11]

While the ALJ correctly notes that there are several entries in Claimant's medical records documenting mostly normal physical findings, including as to range of motion, the ALJ gives very limited consideration to Claimant's consistent reports of pain and indicates that there is not significant documented evidence to support Claimant's alleged symptoms. However, as noted above, the record consistently documents Claimants reports of back, left hip, hand, and knee pain. Objective testing demonstrated that as far back as 2010 Claimant had documented osteoarthritis in her neck and back. There were objective and documented findings by Claimant's treating provider

---

[11] It is difficult to imagine how Claimant, who as the ALJ noted had experienced a complete loss of joint space, reported swelling in her knee and legs when on them for an extended period, and was facing the possibility of a knee replacement, and was obese, could be expected to stand for 4 hours in a workday. (Tr. 913-14).

at the Health Department that the joints of her hands were warm and swollen, and her sedimentation rate documented the presence of inflammation in her body. Although Claimant was unable to provide medical records that dated that far back, she advised that she had undergone right hand carpal tunnel surgery and was also to have it on the left was but unable to do so. The ALJ noted the lack of medical records but gave no reason as to why Claimant's report of this surgery and the need for it to be performed on the other hand was unreliable, especially given that her complaints of pain were consistent with her statements. While Dr. Higgins did not diagnose Claimant with severe bilateral knee varus degenerative joint disease in her knees until 2021, she had been reporting pain in her knees for many years, and such a severe case of osteoarthritis in the knees would not be expected to develop overnight. To add to the challenges Claimant has faced in dealing with the physical conditions, she is obese and has been throughout the pendency of her case. In fact, as the record reflects, the ALJ's failure to consider the impact of Claimant's obesity on her ability to work was the primary reason that Claimant's case was previously remanded. While the ALJ did classify Claimant's obesity as a severe impairment on remand, there was very limited analysis of how obesity impacted Claimant and the ALJ did not take it into account in formulating Claimant's RFC, instead focusing more on the fact that Claimant failed to follow her treating providers' instructions that she lose weight and stop smoking. (Tr. 919). Of further note, the record makes it clear that Claimant continued to report this significant level of pain while her level of activity was quite limited.

In *Wyatt v. Sec'y of Health & Human Servs.,* 974 F.2d 680, 686 (1992), the Sixth Circuit observed that "subjective complaints of pain may support a claim for disability." (citing *Duncan v. Sec'y of Health & Human Servs.,* 801 F.2d 847, 852 (6th Cir.1986)). Further, the Court has observed that "in many disability cases, the cause of the disability is not necessarily the underlying

condition itself, but rather the symptoms associated with the condition." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 247 (6th Cir. 2007) (citing 20 C.F.R. § 416.929; *Wyatt,* 974 F.2d at 686). In the case at hand, while the Court agrees with the ALJ's finding that the record does not fully support the extent of physical limitations asserted by Claimant, the objectively documented evidence that Claimant has significant osteoarthritis throughout her body would appear to support Claimant's assertion that her condition was significantly more limiting than the ALJ determined it was during both the pre and post June 2021 timeframe. While the Court is recommending remand of this matter primarily based upon the ALJ's treatment of Claimant's intellectual and other mental health disabilities, the Court does find that the ALJ's findings as to Claimant's physical health issues may well have fallen outside her zone of choice and may not be supported by substantial evidence. This is especially true given the mandate that Claimant's physical impairments be considered in conjunction with her documented and significant intellectual and mental health conditions.

Of additional note, although the ALJ states in her opinion that Claimant had medical care available to her throughout the pendency of this matter and correctly notes that Claimant did receive care and testing from limited providers, the record also makes clear that Claimant did not have health insurance nor funds to pay for treatment with specialists or for expensive medical testing. (Tr. 88, 917). Instead, she was relying on community health services, emergency room visits, and medical charity as is demonstrated by the treatment providers who saw her during the relevant timeframe. Her ability to obtain treatment was so limited that at one point she received a voucher from the Health Department for the Lions club so that she could get glasses and an eye exam because she had been unable to afford to attend to these basic medical needs in more than five years. (Tr. Ex. 13F, p. 1549).

#### d. *Testimony of the Vocational Expert*

Jacquelyn Schabacker testified as a vocational expert ("VE") during Claimant's November 18, 2021 hearing. (Tr. 980). When formulating her initial hypothetical for the VE, the ALJ included certain assumptions that appear to be inconsistent with the medical evidence of record. For instance, she asked that the VE assume that Claimant could lift 25 pounds frequently and 50 pounds occasionally and could still engage in handling and fingering frequently, despite evidence in the record addressed above that Claimant had experienced significant pain and inflammation in her hands and had testified that she needed carpal tunnel release surgery on her left hand but could not afford it. (Tr. 1007). Additionally, despite longstanding complaints of knee pain and documented evidence of severe bilateral osteoarthritis that would provide objective evidence to support the limitations Claimant asserted, the ALJ still had the VE assume that Claimant retained the ability to occasionally kneel, stoop, crouch, crawl, and walk for a total of 6 hours in an 8-hour workday. *Id.*

The ALJ did pose other hypotheticals to the VE that included further restrictions on the tasks that Claimant could perform, asking that the VE opine as to the jobs available to Claimant with those additional restrictions. *Id.* at 1008. In response, the VE testified that even with those additional limitations, there would be light and sedentary jobs available to Claimant. *Id.* at 1008-10. Still, the ALJ ultimately determined that Claimant was capable of performing medium exertion work up until June 2, 2021, a date that comes after Claimant's date last insured. (Tr. 901, 906).[12]

---

[12] This finding is important because if Claimant was limited to a sedentary level of physical exertion, as an individual closely approaching advanced age who had a limited, or even lesser degree of education, and experience with unskilled work only, she would be disabled according to 20 C.F.R., Part 404, Appendix 2, § 201.09. (The Claimant was not an individual closely approaching advanced age at the time of her alleged onset date but reached that classification during the pendency of this matter.)

Importantly, the ALJ does not appear to have included any limitations when formulating Claimant's RFC based upon Claimant's mental health conditions, aside from any intellectual functioning limitations. Further, the record fails to demonstrate that the ALJ considered whether the ongoing difficulties Claimant experienced due to her bipolar disorder with psychosis, anxiety and depression, excoriation disorder, and post-traumatic stress disorder would be expected to cause her to miss work more frequently than would generally be tolerated in the workplace. This is significant because the VE testified that if a claimant were to miss two days of work per month on an ongoing basis there would be no jobs that would exist for that claimant in the national economy. (Tr. 1010).

### e. *Remand versus an Award of Benefits*

In recommending that this case be remanded for further consideration, the Court has not overlooked Claimant's request that the Court order an award of benefits outright. "In cases where there is an adequate record, the Secretary's decision denying benefits can be reversed and benefits awarded if the decision is clearly erroneous, proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking." *Mowery v. Heckler,* 771 F.2d 966, 973 (6th Cir. 1985) (awarding benefits directly rather than remanding where a claimant's lowest I.Q. score was less than 69 and he had been limited to light or sedentary work). However, the Sixth Circuit has cautioned that a court can reverse an ALJ's decision and immediately award benefits only if all core factual disputes have been resolved **and** the record adequately establishes that a claimant is entitled to benefits. *Faucher v. Sec'y of Health and Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994) (emphasis added). Because of the very high burden a claimant bears in requesting an award of benefits directly from the court, when this Court determines that an ALJ has erred, it is typically clear that remand is the only appropriate avenue for addressing the ALJ's error. Here,

the question of whether to recommend a direct award of benefits was a much closer call. Claimant's case has now been pending for seven years. (Tr. Ex. 1D). Additionally, it has already been remanded once by the Court for further consideration; yet, on remand the ALJ again failed to properly consider the record evidence. Moreover, when considering Claimant's intellectual disabilities, long-standing and serious mental health challenges, and her physical impairments all in conjunction with one another, as applicable law requires, it is difficult to see how Claimant retains the ability to engage in substantial gainful activity. Still, the Court finds that there is just enough contrary evidence to prohibit proof of disability from being overwhelming in this matter; therefore, the Court finds that applicable case law compels the Court to recommend remand versus an award of benefits.

## IV.     CONCLUSION

After a careful review of the record in this matter and for the reasons stated above, the Court finds that the ALJ improperly rejected the opinion evidence provided by Dr. Langford, pursuant to its own applicable regulations. In doing so, the ALJ likewise failed to consider in any way the impact Claimant's documented intellectual functioning limits have on her ability to work and to do so in combination with her other mental health conditions and physical limitations as required. In reaching these conclusions, the Court emphasizes the importance of the Commissioner complying with agency procedures to protect claimants from "bewilder[ment] when told by an administrative bureaucracy that [they are] not. . ." disabled when they have previously been told that they are disabled. *Hardy*, 2021 WL 3702170, at *6 (quoting *Wilson*, 378 F.3d at 544). The methodology utilized by the ALJ in rejecting Dr. Langford's opinion simply does not comport with the requirements set forth in applicable law. Accordingly, the Court **RECOMMENDS** that Claimant's Motion [Doc. 18] be **GRANTED** as outlined herein, and Commissioner's Motion

[Doc. 21] be **DENIED**. More specifically the Court **RECOMMENDS** that this case be

**REMANDED** for further consideration as outlined above, pursuant to 42 U.S.C. § 405(g).[13]

Respectfully submitted,

/s/Cynthia Richardson Wyrick
United States Magistrate Judge

---

[13] Objections to this Report and Recommendation must be filed within 14 days after service of this recommended disposition on the objecting party. 28 U.S.C. 636(b)(1); Fed. R. Civ. P. 72(b)(2). Such objections must conform to the requirements of Fed. R. Civ. P. 72(b). Failure to file objections within the time specified waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive, or general. *Mira v. Marshall*, 806 F.2d 636 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370 (6th Cir. 1987).